NANCY A. JOHNSON et al. *v.* JAMES NATIONS et al.

Where A. purchased certain property from B., who at the time made a bill of sale of a property to C., who with A. made a joint note for a portion of the purchase-money due for the property to B., and in the mean time C. made a deed of gift, which was recorded, of the property to D., a child of A., and delivered the property into the possession of A., with whom D. lived at the time.    Subsequently, A. executed on some of his property a mortgage to B., to secure the balance of the purchase-money due B., and also a mortgage on the property purchased, which had been transferred to D.    *Held*, that no fraud appearing in the transaction, the mortgage is void as between the parties, as to the property which had been transferred to D. ·

If A. executes a note to B., who demands and receives a mortgage on property as a security for the note, and B., after the execution of the mortgage, delivers the note to A., *held*, that the evidence of the indebtedness which the mortgage was to secure, being in the hands of A., it is *primâ facie* evidence that the mortgage has been discharged.

In error from the northern district chancery court at Carrollton; Hon. Henry Dickinson, vice-chancellor.

Nancy Ann Alvis, a minor, by her next friend, on the 26th of October, 1846, filed her bill in the northern district chancery court at Carrollton, against the defendants, James Nations

and Joseph Nations, to recover two negro slaves, Ellen and Matilda.

On the 23d of January, 1838, James Nations sold and delivered to Tilford M. Alvis, the two negro slaves (Ellen and Matilda), and by a bill of sale duly executed, conveyed the negroes to Alvis, which contained a receipt for the purchase-money. On the 5th of February, 1839, Tilford M. Alvis, who is the brother of the said Nancy Ann Johnson, made and duly executed to her a deed of gift for said negroes, and transferred to her the title to them, by delivery of possession, who held them until February, 1843, when they were, in the county of Shelby, State of Tennessee, taken from her possession by defendants and brought back to Mississippi. The defendants have retained possession of the negroes, and the bill is filed to recover the negroes and their hire, from the time defendants took possession of them. The detailed statement of the facts will be found in the opinion.

The vice-chancellor decreed in favor of the defendants (Nations), and complainants prayed a writ of error to this court.

*Sheppard* for appellants.

*E. S. Fisher* for appellee.

Mr. Chief-Justice SMITH delivered the opinion of the court.

This bill was filed by the plaintiff in error, Nancy A. Johnson, whilst a minor, by her next friend. Pending suit, she intermarried with James Johnson, who, upon petition, was made a party to the suit. The bill was filed to recover possession of certain slaves held adversely by the defendants, and for an account of the hire of said slaves.

The title set up in the bill, rests upon a gift made to complainant, Nancy Ann Johnson, by her brother in 1839. The material question in the case is, whether that title was valid or not. The evidence in reference to complainant's title is clear and distinct, and, if credible, leaves no room to question its validity. From that evidence it appears, that Tilford M. Alvis, by whom the gift was made, purchased the slaves in contro-

versy, from the defendant James Nations, in 1838, and received from him a bill of sale for the same.    The bill of sale contains a receipt for the price.    Alvis received immediate possession, and retained it until the slaves were delivered by him into the possession of the elder Alvis, the father of complainant, as her property; at the same time assigning the bill of sale to her. The bill of sale, with the assignment indorsed thereon, was, within a short time, recorded in the proper office in Lafayette county, where the parties then resided.

No consideration was necessary to support the declaration; and the delivery made to the father under the attendant circumstances, was doubtless sufficient to vest the property in complainant, so far, at least, as the title of Tilford M. Alvis was concerned.    The slaves remained in the possession of the complainant or her father, down to the time when they were clandestinely taken from his possession, in Shelby county, Tennessee, whither, in the mean time, he had removed, by the defendants, who brought the slaves within the State of Mississippi.

The defendants answered, and made their answer a cross-bill. They alleged that the elder Alvis negotiated the contract for the purchase of the slaves, and paid about seven hundred dollars of the purchase-money at the time of the sale, and that, at his request, the bill of sale was made to Tilford M. Alvis. A note was given for the remainder by him, in which the elder Alvis joined, and who is alleged to have been the real purchaser, and owner of the property.    They aver that the title was made to Tilford M. Alvis, for the purpose, on the part of old Alvis, to screen it from his creditors.

The defendants defend their possession by virtue of a mortgage, alleged to have been executed by the elder Alvis in 1840, upon the slaves, to secure the portion of the purchase-money then remaining unpaid.    They pray an account to be taken, and that the mortgage may be foreclosed, the property sold, and the proceeds applied to the payment of the debt due to James Nations secured by it.

The complainants in their answer to the cross-bill admit the execution of the mortgage by old Alvis; but aver that the mortgagor had no title to the slaves; that their rights could not

13 *

thereby be prejudiced, and that the mortgage was taken by defendant James Nations, with a full knowledge of the title of complainant, Nancy Ann Johnson.

In reference to this transaction, the elder Alvis testified that he was indebted to James Nations, in something over three thousand dollars, and that in January, 1841, he gave Nations a mortgage on several slaves, his own property, to secure the debt. That, afterwards, at his solicitation, he gave Nations a further mortgage on the negroes which belonged to his daughter, of whose title he was informed by witness, who told him that he had no right to execute the mortgage, and that it would be unavailing.

This witness further testified, that, subsequently, he had a settlement with said Nations, who gave back one of the negroes of witness, which had been previously mortgaged; that Nations denied that he then had the mortgage for the negroes of complainant, and said he had lost it; and that he then received from him the paper for which the property of his daughter had been mortgaged. The note made by Tilford M. Alvis and this witness for the remainder of the purchase-money of the slaves, was filed as an exhibit to the answer to the cross-bill.

The testimony of Wyatt, the only witness examined by the defendants, is in conflict with the statements of Alvis. We should judge that neither witness was entitled to much consideration. We think, however, the preponderance of the evidence is on the side of the complainants, as defendant's answer admits the delivery of the said note.

Upon this state of facts, the vice-chancellor rendered a decree dismissing the bill.

It is manifest from the whole evidence, that the elder Alvis had no title or interest in the slaves, which was susceptible of being transferred by his deed; for, unquestionably, the title of the complainant derived from the gift to her, was valid as to him. Hence, no claim could be founded upon the mortgage relied on by the defendants. If the slaves were liable for the unpaid purchase-money, it was not by virtue of any lien created by the mortgage deed. If they were subject at all to the payment of defendant's claim, it was upon the sole ground that

they were in fact purchased and paid for by the elder Alvis. For, upon the supposition that the title was made to Tilford M. Alvis at the suggestion of the elder Alvis, who was the real purchaser, for the fraudulent purpose of evading the payment of debts, the title which passed, though void as to his creditors, was valid between these parties. The delivery up of the note given for the unpaid purchase-money, if induced by the fraudulent representations of the maker, would not extinguish the debt. Neither could the execution of the mortgage have that effect, if the party were induced to accept it, by similar means. If that transaction were a fraudulent device by which it was designed to screen the property purchased from the claims of creditors, it remains still subject to the debt for which the note was given, and hence the complainant would not be entitled to regain possession of the slaves, without first paying the amount due.

But we think the evidence scarcely sufficient to authorize the conclusion that there was fraud in the purchase of the slaves. It is true, there are some very suspicious circumstances connected with it. And if our decision depended alone on the question whether there was fraud in that transaction or not, we should hesitate to say that it was a fair one. But there is another point, in regard to which the evidence is in favor of the complainants. According to the weight of evidence, the debt claimed by the defendant James Nations, was discharged in 1841. As we have seen, the elder Alvis proves that he settled with Nations, who delivered to him the paper for which the negroes of Mrs. Johnson had been mortgaged. This is admitted in the answer. It is not to be credited, that a party holding a note, and who exacted security by mortgage, would, upon the execution of the mortgage, deliver into the hands of his debtor the evidence of his debt, and which, in the possession of the mortgagor, would be *primâ facie* evidence that the mortgage was discharged.

Upon the whole view of the subject, we think the complainants should recover the slaves, and that they are entitled to an account for their hire during the time defendants have held possession of them. The decree of the vice-chancellor must,

therefore, be reversed, and a decree rendered in this court for the slaves, and the cause remanded for an account to be taken in the court below.

FISHER, J., having been counsel in the court below, gave no opinion.